UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| MICHAEL VAN AELSTYN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 23-136-DCR |
| | ) | |
| V. | ) | |
| | ) | **MEMORANDUM OPINION** |
| COLEMAN SPARKS, et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the defendants' motion for summary judgment.  [Record No. 66] The motion will be granted for the reasons that follow.

**I.**

This case presents two competing stories with drastically different implications. Plaintiff Michael Van Aelstyn alleges a coordinated, malicious, and invidious conspiracy whereby Officer Coleman Sparks and Sergeant Carnes of the Versailles Police Department falsely investigated, arrested, and prosecuted him for baseless assault and strangulation accusations for which a grand jury later declined to return an indictment.

The defendant officers interpret the facts differently.  They allege that Van Aelstyn "assaulted and strangled his live-in fiancée," that their legitimate inquiry "sparked a Department of Justice . . . investigation," and, "angry that their investigation exposed his criminal acts and cover-up," Van Aelstyn "now attempts to take Defendants Sparks and Carnes down with him."  [Record No. 66-1, p. 1]

- 1 -

**The July 8, 2021 Incident**

The events giving rise to this case occurred on the night of July 8, 2021, and continued into the early morning hours of July 9th.  The plaintiff and his then-fiancée, Stephanie Gibbon, went out that evening for drinks and entertainment, returning to their residence later that night. [Record No. 72, p. 2]  At some point, Gibbon accused Van Aelstyn of cheating on her, which led to a major escalation and conflict.  The subsequent events are disputed, but the Court views the facts in the light most favorable to Van Aelstyn as the non-moving party.

According to Van Aelstyn, upon arriving home, he immediately "sought to deescalate the situation by separating himself to his bedroom and locking the door" but Gibbon "busted through the door and began physically assaulting him."  [*Id.*]  As Van Aelstyn attempted to exit, Gibbon kicked him while she was lying on the floor, attempting to block the entrance to the bedroom.  Van Aelstyn caught her foot and was pushed backwards into the hallway.  He asserts that he took a couple additional steps backwards and released her foot.  [Record No. 66-24 at 12:28-13:05]

As Van Aelstyn re-entered the bedroom to get the keys to his truck, Gibbon put her arm around his neck, scratching him with her ring.  [Record No. 66-24 at 14:28-15:18]  Van Aelstyn stumbled and rolled her onto the bed, but claims that he did not choke Gibbon.  [Record No. 66-24 at 15:18-16:15]  However, Gibbon accused the plaintiff of choking her.  Van Aelstyn believed she would use this allegation to destroy his career with the FBI.  [Record No. 66-24 at 16:15-16:40]  Thus, he began audio recording the incident.  Relevant excerpts of the transcript include the following:

Gibbon: "Oh, motherf*cker, you held me down, was chokin' me!"

Van Aelstyn: "I didn't f*cking hold you down and choke you!"

Gibbon: "You motherf*cker, on that bed!"

Van Aelstyn: "You are so—you are so full of sh*t!"

** ** **

Van Aelstyn: You are so full of sh*t.

Gibbon: Oh boy, Mike.

Van Aelstyn: Yeah, that's exactly what you did, you grabbed your own throat "Oh my God.  Oh my God."

Gibbon: Oh yeah, that's exactly what the f*ck I did.

Van Aelstyn: You did!

Gibbon: Just like I broke my own motherf*ckin' leg.

Van Aelstyn: You did.  Oh, you just slapped me, too?  'Cause that's good!

Gibbon: Yeah, I just f*ckin' slapped you.

Van Aelstyn: And again!

Gibbon: And I'll slap you again!  I'll f*ckin' kick you in the nuts, 'cause that's what you f*ckin' deserve!

Van Aelstyn: Try it again.

Gibbon: Oh, you wanna f*ckin' fight?

Van Aelstyn: No, I don't!

Gibbon: You wanna f*ckin' fight?!

Van Aelstyn: No, I don't!

Gibbon: I do!

** ** **

Van Aelstyn: You're godd*mn right I have my recorder.  I've been recording this entire thing.

- 3 -

Gibbon: Okay, good!  Then I'll send the recordings of you and my—and my pictures of my f*ckin' back!

Van Aelstyn: Where you—tried to f*ckin' throw me down and you fell into the fridge?

Gibbon: Oh, yeah, oh, I know I'm a big woman, and I f*ckin' could throw you down.

Van Aelstyn: You tried to, and you fell.

Gibbon: Okay.  Whatever.  Whatever, just like I broke my f*cking leg.

Van Aelstyn: You did break your leg!  You told everybody!

Gibbon: I broke my leg because you f*ckin' threw me down.

[Record No. 72-1, p. 1-2, 5, 7]

The recording captured Gibbon conceding that she had planned the confrontation, stating she "knew what would happen tonight and . . . played it to the key" because she suspected Van Aelstyn had been cheating on her for weeks.  [Record No. 72-1, p. 5-6, 9] According to Van Aelstyn, during the recording he went downstairs to the kitchen to put Gibbon's phone in water, because he paid for it, and she was attempting to falsely accuse him of abusing her.

When his attempts to submerge Gibbon's phone failed, Gibbon tried to grab him, he pulled away, and she slipped and fell, hitting a cabinet handle which caused a large gash to her back.  [Record No. 66-9 at 06:11; *see also* Record No. 66-7, p. 1] And at some point, she also kicked a hole in the wall.  [Record No**.** 72, p. 3]

After multiple failed attempts to contact police, Van Aelstyn left the premises and later returned home to discover that Gibbon had left.  [*Id.*]  Gibbon left shortly afterwards, spending the next hour or so with a neighbor (Floyd Monroe).  [Record No. 73, CD 2 (12), at 4:30:02-4:30:19 p.m.]

- 4 -

**Interviews with Police**

Around 2:24 a.m. on July 9th, Gibbon and her daughter Sydney Brown (the driver of the vehicle) were pulled over by Officer Sparks after he noticed their vehicle's headlight was out. [Record No. 66-5, 02:25:05] Gibbon told Sparks she had a "blowout" with the plaintiff, and alleged she had a scratch on her back from where Van Aelstyn "threw her down." [*Id.* at 02:25:50-02:26:05] After showing Sparks the cut on her back, she reiterated her accusation that Van Aelstyn "threw her against the thing." [*Id.* at 02:27:00-02:27:05] Sparks asked whether Gibbon wanted to report the incident but she declined. [*Id.* at 02:27:56-02:28:04] "Nevertheless, Sparks returned to his vehicle and contacted Defendant Scott Carnes." [Record No. 72, p. 4]

Sparks advised Carnes that Gibbon was not interested in reporting the incident, but asked, "given he's law enforcement, don't we need to do something with there being an assault?" [Record No. 66-5, 02:30:19-2:31:00] Carnes responded they should do "the same thing we do for anybody else." [*Id.* at 02:31:00-2:31:05] Sparks then told Carnes he could "trick" Gibbon into coming to the station to file a courtesy notice, but Carnes told Sparks to interview Gibbon's daughter Sydney Brown in his vehicle instead. [Record No. 66-5, 02:34:49-2:35:30]

Sparks interviewed Brown to ask about Gibbon's allegations. In response, Brown indicated that Van Aelstyn had pushed Gibbon down and pulled her down the hallway toward the bedroom. [Record No. 66-5, 02:39:58-2:40:30] Brown further stated that Van Aelstyn had broken Gibbon's leg during a past incident. [Record No. 66-5, 02:40:45-2:41:05] Brown returned to her car after Sparks instructed her that, if asked, she should indicate she had been

questioned about narcotics.    [*Id.* at 02:46:43-2:46:50] However, "Sparks did not return Gibbon's drivers' license, forcing a second encounter." [Record No. 72, p. 4]

"The Versailles Police Department's second encounter with Gibbon and her daughter occurred in the station's parking lot.  It is unknown when this encounter began, as Sparks did not equip his body camera until mid-conversation."  [*Id.*, pp. 4-5] Around 3:22 a.m., Sparks asked Gibbon to take off her outer layer of clothing so that he could photograph the cut on her back.  [Record No. 66-6 at 03:22:55-03:23:01]

As Gibbon began taking off her sweatshirt, she told officers that she had also been choked, and that she would expect to have bruises on her neck the next day.  [*Id.* at 03:23:11-03:23:17]  She indicated that it was "sore to swallow" and that she was unable to breathe when the plaintiff allegedly choked her.  [*Id.* at 03:25:04-03:25:12]  Gibbon further recounted that Van Aelstyn had dragged her down the hall by her arms, but stated, "well, I think maybe it was more—he was dragging me by my legs" when asked if there were any marks on her arms. [*Id*. at 3:25:12-3:25:21]  Gibbon later told Officer Sparks and Officer Miller that Van Aelstyn had dragged her from the bedroom to the kitchen, and that afterwards, the plaintiff had choked her "again."  [*Id*. at 3:31:49-3:32:56]  "Gibbon and her daughter left without filing an EPO or a complaint."  [Record No. 72 at 6]

Following the second meeting with Gibbon, Officer Sparks and Sergeant Carnes drove to Van Aelstyn's residence for further investigation of the incident.  Around 4:20 a.m., the defendants interviewed Van Aelstyn.  [Record No. 66-9 at 04:21:42] When describing the altercation, Van Aelstyn admitted to "playfully" dragging Gibbon down the hall.  [*Id.* at 04:21:39-04:21:47]  He then told the officers that Gibbon slipped and hit her back on a cabinet handle after attempting assault him, repeating that he would never hurt Gibbon.  [*Id.* at

- 6 -

04:22:15-04:22:24]  But when asked about the audio recording, Van Aelstyn indicated that he
was not comfortable sharing it.  In response, Carnes asked that he "hold on" to it.  [*Id.* at
04:22:55-04:23:07]

Carnes later questioned Van Aelstyn about the redness observed on Gibbon's neck.
[*See* Record No. 66-7, p. 2.]  Van Aelstyn denied choking Gibbon, but instead indicated that
he "hip-tossed" her onto the bed.  [Record No. 66-9 at 04:27:57-04:28:24]

Gibbon submitted a petition for an emergency protective order ("EPO") the next day
based upon allegations that Van Aelstyn "threw [her] into the cabinets . . . pulled [her] across
the floor all the way down the hall . . . [and] threw her on [the] bed and choked [her]."  [*See*
Record Nos. 66-11, p. 1 and 66-12.]  The EPO was served at 4:42 p.m. that afternoon.  At that
time, Van Aelstyn asked Officer Radford to document his injuries and damage to the property.
[*See* Record No. 73, CD 1 (7), at 16:42:10 and 16:44:10 p.m.]  Radford photographed scratches
on the plaintiff's arms, legs, and back, and damage to a wall and door frame.  [Record No. 72-
2]  The defendants "took no further action with respect to these photos, nor did they confront
Gibbon as to the cause of Plaintiff's injuries."  [Record No. 72, p. 8]

After midnight on July 22, 2021, Officer Sparks interviewed Gibbon once again after
county attorney Alan George requested that Sparks follow up with her, given the discrepancies
with her initial allegations.  [*See* Record No. 72-8, p. 5.]  Gibbon told Sparks that if she had
previously stated she was choked twice, it was a mistake.  And if she misspoke, it could have
been because Van Aelstyn had choked her in the past.  [Record No. 66-16 at 00:03:44-
00:04:15]

Gibbon repeated her allegations that she was choked and dragged down the hall on the
night in question.  [*Id.* at 00:26:55-00:27:30]  Initially, when Sparks mentioned the injury

- 7 -

Gibbon sustained from hitting the cabinet, she seemingly disputed Van Aelstyn's account, stating "he says that, that I 'fell.'"  [*Id.* at 00:05:30-00:05:40]   But when Sparks asked her about the injury later during the interview, she declined to elaborate regarding whether she fell or was thrown against the cabinet.  [*Id.* at 00:20:54-00:21:15]

Gibbon notes that her memory of events differed from those depicted in the EPO petition and mentions that someone else transcribed the petition.  [*Id.* at 00:04:18-00:04:29] Ultimately, in the version of events she detailed to Sparks during this interview, Gibbon stated that she was choked, at a later point she hit her back on the kitchen cabinet following a struggle over her phone, and Van Aelstyn dragged her across the hall and then left the house.  [*Id.* at 00:19:20-00:27:50]

### Subsequent Criminal Proceedings

Sparks updated the county attorney with information obtained during the July 22, 2021, interview, "a criminal complaint against Michael Van Aelstyn was sworn to, and signed . . . on August 10, 2021," and Van Aelstyn was arrested on August 13, 2021.  [*See* Record No. 66-18, p. 1 and Record No. 72, p. 5.]  The criminal complaint alleged that Van Aelstyn "assaulted and strangled his fiancée, Stephanie Gibbon."  It detailed the chronological order of allegations as follows: "[the] defendant caused Gibbon's back to hit hard against a cabinet handle, causing a laceration and significant pain . . . he got on top of her and wrapped a hand tightly around her throat, and applied a great amount of pressure . . . [and then] he started to drag her through their house[.]"  [Record No. 66-20, p. 1]

On January 3, 2022, the Woodford County District Court held a preliminary hearing to determine whether there was probable cause for charges of fourth-degree assault and first-degree strangulation.  [Record No. 72 at 12]  Sparks was questioned during the hearing about

the timeline of events on the night of July 8, 2021. County attorney George asked the officer, "[a]ccording to her [Gibbon] what happened first? Was it the choking then dragging? The dragging then choking?" [*Id.*] Sparks replied that, "on the traffic or the first interview she said that the choking happened first, then she was drug out of the room and pushed in—later pushed, subsequently pushed in, after fighting for the phone, into the cabinet door. On further interview, it hadn't changed as far as that." [*Id.*]

The district court found there was probable cause to charge Van Aelstyn with fourth-degree assault and first-degree strangulation. [Record No. 72, p. 13] On September 7, 2022, the case was presented to a state grand jury. At that point, Van Aelstyn produced his audio recording. [Record No. 72, p. 13] "The Grand Jury then returned its 'Order Upon Failure to Indict No True Bill' on all charges, finding there was no probable cause that a crime was committed by Plaintiff on July 8, 2021." The criminal case against Van Aelstyn was dismissed thereafter. [*Id.*]

## II.

Summary judgment is appropriate when the moving party shows that there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To meet that standard, a movant must show that the nonmoving party has failed to produce evidence to support at least one essential element of his or her claim. *See Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted)).

Once the moving party has satisfied this burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial. *McLaughlin v. Fifth Third Bank,*

*Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing Fed. R. Civ. P. 56(e)).  In other words, the nonmoving party must present "significant probative evidence that establishes more than some metaphysical doubt as to the material facts."  *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (citation and alteration omitted).

In evaluating summary judgment motions, the Court views the "evidence in the light most favorable to the nonmoving party."  *Lang v. City of Kalamazoo*, 744 F. App'x 282, 285 (6th Cir. 2018) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003).  The undersigned may not weigh the evidence or make credibility determinations but must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52 (1986).  *See also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).  However, "where video evidence depicts the events," the Court "view[s] the facts 'in the light depicted by the videotape' and do[es] not adopt a version of the facts that is 'blatantly contradicted by the record.'  *Jackson-Gibson v. Beasley*, 118 F.4th 848, 853–54 (6th Cir. 2024) (quoting *Scott v. Harris,* 550 U.S. 372, 380-81 (2007)).

### III.

### A.  False Arrest

"[T]he statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process."  *Wallace v. Kato*, 549 U.S. 384, 397 (2007).  Stated differently, the statute of limitations for false arrest claims "begins to run on the date of the individual's arrest."  *Davis v. Butler Cnty., Ohio*, 658 F. App'x 208, 214–15 (6th Cir. 2016).  *See also Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir.

2007).  In Kentucky, the statute of limitations for false arrest is one year.  *See* KRS § 413.140. And "federal courts must borrow the statute of limitations governing personal injury actions in the state in which the § 1983 action was brought.  *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003).  Consequently, the Court borrows Kentucky's one year statute of limitations in evaluating the timeliness of the plaintiff's false arrest claim.

Van Aelstyn was arrested on August 13, 2021.  [Record No. 72, p. 25]  He argues that his false arrest claim accrued after the grand jury declined to indict him, and *not* the day he was arrested.  However, this directly contradicts the United States Supreme Court's holding in *Wallace*.  He further contends that if the statute of limitations began to run the day of his arrest, that "would mean that [the] Plaintiff was required to bring this claim before the charges proceeded to the Grand Jury in September 2022."  [*Id.*]  That is correct.  Van Aelstyn cites *Shamaeizadeh v. Cunigan*, 182 F.3d 391, 399 (6th Cir. 1999), in support of the later accrual date, but *Shamaeizadeh* was "divested of continuing vitality by the Supreme Court's [then] recent decision in *Wallace*[.]"  *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 639 (6th Cir. 2007).  Thus, Van Aelstyn's false arrest claim expired after August 13, 2022, because (1) he was arrested on August 13, 2021; (2) the statute of limitations for false arrest is one year under Kentucky law; and (3) this Court "borrow[s] the statute of limitations governing personal injury actions in the state in which the section 1983 action was brought."  *Banks*, 344 F.3d at 553.

## B.  Malicious Prosecution

"[D]amages for [a false arrest] . . . claim cover the time of detention up until issuance of process or arraignment.  From that point, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention

itself." *Wallace v. Kato*, 549 U.S. at 390. Federal malicious prosecution claims "are rooted in the protections afforded by the Fourth Amendment." *Tanner v. Walters*, 98 F.4th 726, 734 (6th Cir. 2024). To succeed in making such a claim, a plaintiff must prove:

> (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Id.* (citing *France v. Lucas*, 836 F.3d 612 (6th Cir. 2016)).

And in Kentucky, to establish malicious prosecution, a plaintiff must show:

> 1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff;
> 2) the defendant acted without probable cause;
> 3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based;
> 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and
> 5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016).

The parties spend most of their arguments disputing the second element of malicious prosecution; that is, whether Officer Sparks and Sergeant Carnes had *probable cause* to pursue criminal proceedings against Van Aelstyn. This is required under both federal and Kentucky law. To be sure, there are genuine disputes of fact regarding Van Aelstyn's and Gibbon's altercation. But the parties do not dispute the material facts established by the body camera footage recorded by police and which form the nucleus of probable cause. And while they characterize the validity of subsequent proceedings differently, they do not dispute the veracity of the core procedural events.

- 12 -

In adjudicating malicious prosecution claims, courts "must consider not only whether the Defendants had probable cause to arrest the Plaintiff but also whether probable cause existed to initiate the criminal proceeding." *Sykes v. Anderson*, 625 F.3d 294, 310–11 (6th Cir. 2010) (cleaned up).  "The demands on government increase the more it intrudes into its people's liberty.  The government . . . must meet a lower standard to indict and detain criminal defendants before trial (probable cause) than the standard it must meet to convict and imprison them after trial (proof beyond a reasonable doubt)." *Lester v. Roberts*, 986 F.3d 599, 602 (6th Cir. 2021) (citing *Draper v. United States*, 358 U.S. 307, 311–12 (1959)).  "[G]iven the reduced burdens imposed on the government at this pretrial stage, the Supreme Court has recognized that cases will inevitably arise in which the government validly establishes the probable cause necessary for a pretrial detention, but later falls short in proving guilt beyond a reasonable doubt. *Id.*

Here, the plaintiff was accused of the state-law crimes of assault in the fourth degree and strangulation in the first degree.  In Kentucky, assault in the fourth degree is defined, in relevant part, as "intentionally or wantonly caus[ing] physical injury to another person." *See* KRS § 508.030.  And strangulation in the first degree occurs when a "person, without consent, intentionally impedes the normal breathing or circulation of the blood of another person by: (a) [a]pplying pressure on the throat or neck of the other person; or (b) [b]locking the nose or mouth of the other person."  KRS § 508.170.

### Probable Cause to Arrest

In this case, the officers opted to wait and obtain an arrest warrant, so evidence they considered in the intervening period between the initial investigation and Van Aelstyn's arrest is relevant.  And while Van Aelstyn's false arrest claim is barred by the statute of limitations,

the existence of probable cause at the investigation's outset remains relevant to the timely malicious prosecution claim.

Probable cause is established when there exists "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Lester*, 986 F.3d at 608 citing *District of Columbia v. Wesby*, 583 U.S. 48 (2018). In this case, the defendants had probable cause to arrest Van Aelstyn because, under the totality of the circumstances, evidence suggested there existed both more than a substantial chance of criminal activity, and a multitude of reasonable grounds to believe that Van Aelstyn committed the two offenses. *See also Kalamazoo*, 744 F. App'x at 289-290.

When Sparks first stopped Gibbon and her daughter for an inoperable headlight, Gibbon told Sparks that Van Aelstyn had "thrown her down" and exhibited a large cut on her back consistent with the assault accusation. Brown then indicated to Sparks that Van Aelstyn dragged Gibbon across the floor. Less than an hour later, as police prepared to photograph Gibbon's injuries at the police station, she told officers she was also choked, and dragged across the floor. Police observed redness around her neck and bruising on her forearm consistent with these claims. But rather than arrest Van Aelstyn without a warrant, Sparks and Carnes decided to interview him to obtain a more complete picture of the case. Rather than denying touching Gibbon, Van Aelstyn admitted to "playfully" dragging Gibbon down the hall and hip tossing her when asked about the redness observed in the area of Gibbon's neck.

When the plaintiff told Sparks and Carnes he had "playfully" dragged Gibbon, he corroborated part of Gibbon's accusations and gave officers a basis to believe her story. Paired with Gibbon's allegations of being dragged across the floor and choked, Sparks and Carnes had a reasonable suspicion that Van Aelstyn assaulted and strangled her in violation of

- 14 -

Kentucky law. "Consistency between an alleged perpetrator's statement and the remaining evidence in a case is certainly relevant to determining not only whether the alleged perpetrator was involved in criminal activity but also the credibility of the alleged perpetrator's repeated exclamations of innocence." *Sykes*, 625 F.3d at 313. Although Van Aelstyn also told the defendants he did not put hands on Gibbon and that he would never hurt her, his contradictory statements gave rise to a substantial chance of criminal activity in the defendants' eyes, establishing probable cause.

In *Kalamazoo*, police arrested Craig Lang following a physical altercation during which he was accused of kicking a third party. Lang pursued false arrest and malicious prosecution claims against the offending officers after the charges were later dismissed, contending their failure to further investigate his asserted innocence violated his rights under the Fourth Amendment. However, as a panel of the Sixth Circuit explained, officers are not required to investigate or interview everyone involved in an altercation. 744 F. App'x at 289.

Here, Sparks and Carnes did not make a rash, uninformed decision to arrest Van Aelstyn. Instead, before filing a criminal complaint, police conducted multiple interviews of Gibbon, an interview of Van Aelstyn, and a follow-up meeting with Gibbon. *Kalamazoo* involved a warrantless arrest but here, the officers took additional steps to gather information beyond what they needed for probable cause to arrest Van Aelstyn. Under the totality of the circumstances, Sparks and Carnes collected sufficient evidence establishing probable cause that Van Aelstyn committed two state law offenses.

**Discrepancies in Gibbon's Story and Alleged Police Misconduct**

Van Aelstyn argues that inconsistencies in Gibbon's story vitiate probable cause. However, these discrepancies were ultimately harmless. Gibbon reported during her second

- 15 -

interview with police that she had been choked. But Van Aelstyn contends this amounts to Gibbon changing her story, given she did not tell Sparks she was choked when she was initially pulled over. But before Sparks pulled her over, Gibbon told her neighbor that the plaintiff had choked her. [*See* Record No. 73, CD 2 (12) at 4:27:47-4:28:00 p.m.] Further, Gibbon never recanted the choking allegation.

Viewed in the light most favorable to the plaintiff, Gibbon's story *did* change multiple times, but even cumulatively, these discrepancies are not enough to undermine probable cause. Gibbon alleged during her second interview with police that she had been choked on two occasions during the incident under investigation. The county attorney had questions about this claim because Gibbon initially stated she was choked only once. [Record No. 72-8, p. 5]

As a result, on July 22, 2021, Sparks conducted another interview with Gibbon to determine why her story was inconsistent. Gibbon indicated that she did not remember telling officers that she was choked twice. However, she indicated that if she previously stated that she was choked twice, it was by mistake or potentially because Van Aelstyn also had choked her in the past and that she was confused. [Record No. 66-16 at 00:03:44-00:04:15] Gibbon also declined to state that Van Aelstyn deliberately threw her against the cabinet during that interview. [*Id.* at 00:20:54-00:21:15] But even so, Gibbon never wavered in her allegations that Van Aelstyn choked her and dragged her across the floor.

Gibbon's chronology of events also changed when it was reported to police, but this is insufficient to negate probable cause. At first, officers were told by Gibbon's daughter that Gibbon was dragged from the kitchen to the bedroom. [Record No. 66-5, 02:39:58-2:40:30] During the second interview, Gibbon told police she was dragged from the bedroom to the kitchen, then choked after that. [Record No. 66-6, 3:31:49-3:32:56] And in the EPO petition,

Gibbon alleged that Van Aelstyn threw her into the cabinets, pulled her down the hall, threw her on the bed, and then choked her. [Record No. 72-7, p. 2] During the July 22, 2024, interview with Sparks, Gibbon stated that the EPO petition was chronologically inaccurate. She contended that she *first* was choked, *then* dragged down the hall. The criminal complaint states that Gibbon was first caused to hit a cabinet handle, choked (on the ground), and then dragged through the home. [Record No. 66-20, p. 1]

Notably, the altercation took place late the night of July 8, 2021, after Gibbon (and to a lesser extent Van Aelstyn) had consumed alcohol. [Record No. 62, p. 71; Record No. 72, p. 2] Afterwards, Gibbon drank "a few" more beers at the neighbor's house before Sparks pulled over the car driven by Brown. [Record No. 72, p. 13-14] And Gibbon's interviews with police began after 2:00 a.m. on the morning of July 9, 2021. These facts suggest that some discrepancies in Gibbon's story are not surprising under the circumstances. Similar to the Sixth Circuit's assessment in *Lester*, Van Aelstyn's "fine-tooth combing over every detail seems more suited for arguments to the jury about why the government did not prove its case beyond a reasonable doubt than arguments . . . about why probable cause did not exist[.]" 986 F.3d at 610.

Sparks' incorrect testimony regarding Gibbon's inconsistencies also fails to undermine probable cause. Officer Sparks testified during the preliminary hearing that Gibbon's story had not changed. [Record No. 72, p. 12] More specifically, he stated that, "on the traffic or the first interview she said that the choking happened first, then she was drug out of the room and pushed in—later pushed, subsequently pushed in, after fighting for the phone, into the cabinet door. On further interview, it hadn't changed as far as that." [*Id.*] While Sparks'

statement was inaccurate, Gibbon's story had not changed regarding the relevant elements of the crimes with which the plaintiff was charged.

Gibbon never recanted being choked in any of her interviews with police. She was consistent that she was assaulted and choked in all of her interviews except the first, which was before she told officers she was choked. These details do not vitiate probable cause. Even if Sparks had testified flawlessly, the district court had sufficient evidence to conclude continued criminal proceedings were appropriate. In the last few minutes of the preliminary hearing, county attorney George contended that probable cause for assault existed because Van Aelstyn admitted to "playfully" dragging Gibbon, and Gibbon had forearm bruising consistent with that specific allegation. He also argued that there was probable cause for the strangulation charge because of the detail and explanation Gibbon provided when asked about being choked, and the redness observed on her neck the morning of July 9, 2021. [Record No. 73, CD 1 (10), 2:45:22-2:47:57 p.m.] The evidence presented during the hearing was sufficient for a finding of probable cause even if inconsistencies in Gibbon's story had been introduced. While George's opinion regarding probable cause is not dispositive, the totality of the circumstances supports the conclusion that Sparks' misstatement was not prejudicial to the state court's finding of probable cause.

Sparks later testified that he "misspoke" when he stated that Gibbon never changed her story. [Record No. 72, p. 17] And the plaintiff acknowledges this. *Id.* However, to the extent the plaintiff claims Sparks provided false testimony at the preliminary hearing, his self-proclaimed mistake does not rise to the level of conduct the Sixth Circuit has required to negate a finding of probable cause. For example, in *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015), an OIG investigation revealed a DEA agent was blatantly fabricating evidence to secure

- 18 -

wrongful convictions.  Specifically, the agent was aware that suspects prosecuted for drug transactions were not present at the government-staged drug buys in which they were accused of participating.  The Sixth Circuit found the agent's false testimony created a factual question of probable cause suited for a jury.  And in *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010), law enforcement both materially misrepresented evidence and omitted extremely probative evidence that compellingly pointed to an alternative culprit.  There, a robbery took place at a Detroit bank, and a police sergeant flagrantly lied about evidence at a preliminary hearing to implicate a victim bank employee in an armed robbery, although video evidence completely contradicted the officer's testimony.  The Sixth Circuit held that the testimony represented enough of a material misrepresentation to call probable cause into question regarding the malicious prosecution claim.

Similarly, in *Tanner v. Walters*, 98 F.4th 726 (6th Cir. 2024), a detective interviewed the plaintiff twice and blatantly fabricated evidence involving both the plaintiff's whereabouts the night of the murder and her ownership of the murder weapon that was later used to determine probable cause.  The Sixth Circuit recognized that without this false testimony, "a reasonable jury could find that these facts . . . would not have provided probable cause to prosecute" the plaintiff.  *Id.* at 736.

Here, Sparks mentioned that the chronology of her story "hadn't changed."  While this was incorrect, the exact timeline of events the night of July 8, 2021, is not dispositive, and under the totality of the circumstances, this statement would not have affected the court's ultimate determination in finding probable cause.

- 19 -

**Exculpatory Evidence**

Van Aelstyn also contends that Officer Sparks and Sergeant Carnes willfully neglected to further investigate the "exculpatory" audio he recorded the night of July 9, 2021. However, this argument fails because the recording did not exonerate Van Aelstyn.

"Exculpatory evidence is evidence which is material to either guilt or punishment[.]" *Brady v. Maryland,* 373 U.S. 83, 87 (1963). "Materiality under *Brady* is a mixed question of law and fact for the jury[.]" *Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (citing *United States v. Phillip,* 948 F.2d 241, 250 (6th Cir.1991)). To exculpate him, the recording would need to either establish that he acted in self-defense regarding the assault and strangulation charges or establish that the assault and strangulation never occurred. But in the recording, Gibbon accuses Van Aelstyn of choking her, as well as throwing her down, which she alleged caused a gash on her back. While the tape does corroborate certain elements of Van Aelstyn's story, it does not conclusively establish that he did not strangle Gibbon, that the gash on her back was not the result of force, or that the plaintiff never dragged Gibbon down the hall. Van Aelstyn repeatedly asserted that he did not choke Gibbon or throw her down, but she never candidly agreed with him. [*See* Record No. 72-1.] The only times Gibbon did agree that Van Aelstyn did not use force were sarcastic references, evinced by her immediately mentioning a prior incident where Gibbon alleged Van Aelstyn had broken her leg. [*Id.*, p. 9]

To the plaintiff's credit, the tape did establish that Gibbon assaulted[1] Van Aelstyn as she admitted that she was hitting him. [*Id.*, 72-1, p. 5] The tape also establishes that, to some

---

[1]    This reference ignores the possibility that Gibbon was acting in self-defense.

extent, the confrontation was planned. But it does not establish the alleged assault or strangulation of Gibbon was fabricated. [*Id.*, pp. 5-6] The fact the plaintiff asserts that Gibbon was untruthful in the recording is not enough to eradicate probable cause.

It is true that Sparks and Carnes admitted they could have subpoenaed the audio recording, instead of merely advising Van Aelstyn to "hold on to it." [Record No. 72, p. 7] But the tape does not exonerate him of the charges. Instead, it merely establishes that Gibbon was physical and that she planned to confront Van Aelstyn about his suspected cheating weeks in advance. Thus, even if Sparks and Carnes had received and listened to the recording, they still would have probable cause to investigate and prosecute the plaintiff for first-degree strangulation and fourth-degree assault.

Van Aelstyn avers that the officers made no attempt to subpoena the recording, and the defendants admit as much. [*See* Record No. 72-4, p. 92.] But it follows that if the audio tape cleared the plaintiff's name, he had the opportunity to present it to law enforcement long before the grand jury hearing. If Van Aelstyn believed it exculpated him, the criminal proceedings could have been terminated much earlier. Instead, he claims the defendants should have taken further steps to obtain the tape. Allowing a malicious prosecution claim to proceed to a jury on those grounds would effectively open the door for putative plaintiffs to withhold exculpatory evidence, reveal it after their arrest and subsequent criminal proceedings, then initiate a civil suit because law enforcement "ignored" exculpatory evidence. Because Van Aelstyn's audio tape was not exculpatory, the Court need not directly address this question. But if it were exculpatory, Van Aelstyn had the option to voluntarily release it much earlier if he truly believed it would clear his name.

- 21 -

Next, Van Aelstyn asserts that an interview with his neighbor (Monroe) would have exonerated him. But Monroe's testimony would not have defeated probable cause because it also failed to negate any of Gibbon's accusations. Monroe mentioned that Gibbon came over to his house at 1 or 2 a.m. [Record No. 73, CD 2 (12), at 4:30:02-4:30:19 p.m.] She told him that she was choked, and he noticed the cut on her back. [*Id.* at 4:27:43 p.m.] Monroe's testimony indicated Gibbon did not directly attribute the cut to the plaintiff, but Gibbon told Monroe that Van Aelstyn choked her before she told the officers later that morning. [*Id.*] Monroe also indicated that he did not notice redness around her neck [*Id.* at 4:28:00-4:28:10 p.m.], but this does not establish the plaintiff's innocence. It merely demonstrates that Monroe had a different view of an injury that the officers deemed significant enough to photograph.

On July 22, 2021, Sparks attempted to interview Monroe, but he advised that he wished to speak with an attorney first. "Sparks stated he would follow-up with them once they had a chance to do so." [Record No. 72, p. 11] "Sparks did not do this, nor did he document his promise to follow-up." [*Id.*] Although Sparks represented he would return to interview Monroe, his failure to do so was inconsequential because Monroe's recollection of the events would also not have exculpated Van Aelstyn.

Neither the audio tape, nor Monroe's testimony are sufficient to qualify as exculpatory under Sixth Circuit precedent. For example, in *Ouza v. City of Dearborn Heights*, 969 F.3d 265 (6th Cir. 2020), a disgruntled ex-husband (Mohamad) was prohibited by a personal protective order from interacting with his former wife, Ehsan Ouza, the plaintiff. Despite the protective order, Mohamad showed up at Ouza's house and assaulted her. Police arrived at the scene and gave Ouza a victim's rights card. Later that day, Mohamad returned and assaulted the plaintiff a second time. When officers arrived at the house a second time,

Mohamad lied and told them *he* was assaulted by Ouza.  As officers arrested the plaintiff, Mohamad admitted to trespassing and being the aggressor, and he explained the plaintiff was acting in self-defense, completely reversing his prior story.  Ouza was arrested, but Mohamad's admissions to police were considered potentially exculpatory enough to have raised a question regarding probable cause.  But in this case, neither the tape, nor Monroe's testimony repudiated Gibbon's story.  Further, Van Aelstyn told officers he dragged and hip-tossed Gibbon, which was consistent with what Brown had told them earlier that night.  Accordingly, no truly exculpatory evidence existed here.

**Known Suspect**

Finally, in many of the cases in which the Sixth Circuit has recognized probable cause to be a question for a jury, courts faced much closer questions of whether police had probable cause under the totality of the circumstances.  In most situations, the suspect was unknown.  In *Lester v. Roberts*, 986 F.3d 599 (6th Cir. 2021), the plaintiff was implicated in a murder based on somewhat shaky testimony of the victim's former associates long after the crime was committed.  The case proceeded to trial, and even the *prosecution* asked the jury to acquit Lester because of uncertainties in the evidence.  But when Lester later attempted to pursue a malicious prosecution claim, the Sixth Circuit found probable cause nonetheless existed to prosecute him under the totality of the circumstances, even though it later became apparent he was not the culprit.

Next, in *McGuire v. City of Royal Oak*, 295 F. App'x 736, 737-738 (6th Cir. 2008), officers told plaintiff McGuire if he did not immediately identify the assailant they sought, "they would pin the crime on him[.]" *Id.* The officers later told county authorities they saw

- 23 -

McGuire commit the crime. *Id.* at 738. There, the Sixth Circuit found officers lacked probable cause to arrest McGuire.

In the case at hand, there was never a question of *who* had allegedly assaulted Gibbon. Instead, the question presented was whether the plaintiff assaulted her at all. Like *Lester*, evidence pointed to Van Aelstyn's likely culpability, except here, the evidence presented was much more compelling because of its temporal proximity to the altercation and because the plaintiff was the only suspect. And in contrast to *McGuire*, officers did not arbitrarily target Van Aelstyn for failing to cooperate. They pursued a criminal action because Gibbon was injured, she accused Van Aelstyn, Van Aelstyn implicitly confirmed at least one of Gibbon's claims, and no evidence surfaced that actually proved Van Aelstyn's innocence.

Ultimately, Van Aelstyn's claims fail to undermine probable cause, and the facts are not analogous to Sixth Circuit precedent where probable cause was held to be a question for a jury. Minor inconsistencies in Gibbon's story are not substantial enough to repudiate probable cause. Further, the audio tape and the neighbor's testimony are not exculpatory. And Sparks' statement at the preliminary hearing fails to sufficiently reach the heights of deceit, fabrication, or misrepresentation of evidence the Sixth Circuit has explained *could* extinguish probable cause. The defendants' inquiry was sufficient to conclude there was probable cause to prosecute Van Aelstyn for the alleged crimes. Because the defendants had probable cause to prosecute Van Aelstyn for fourth-degree assault and first-degree strangulation, even though a grand jury later declined to indict the plaintiff, Van Aelstyn's state and federal malicious prosecution claims cannot survive.

### Qualified Immunity

The defendants argue that even if probable cause did not exist, they are still entitled to qualified immunity from Van Aelstyn's federal malicious prosecution claim. "Officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018) (citing *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). "[T]he plaintiff must show that a defendant's probable-cause finding violated clearly established law . . . [and] [i]n this fact-dependent context, that test will generally require the plaintiff to 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'" *Lester*, 986 F.3d at 608 (citing *Wesby*, 583 U.S. at 590)).

The plaintiff identifies several cases that warrant discussion. First, he relies on the holding in *Ouza* to illustrate a similar instance where a finding of probable cause violated clearly established law. But as discussed previously, *Ouza* involved a party who recanted all of his accusations to police, which Gibbon never did in this case.

The plaintiff next cites *Washington v. Napolitano*, 29 F.4th 93 (2nd Cir. 2022), which involved the concealment of exculpatory details from evidence presented to a judge. But as explained above, Van Aelstyn never possessed exculpatory evidence.

Finally, Van Aelstyn contends that *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015), presents a scenario analogous to the case at hand given similarly "unreliable" testimony. However, in *Wesley* the plaintiff was arrested based on uncorroborated claims from a seven-year old child who evinced serious psychological and emotional disturbances. Further, no

evidence of harm or any crime existed. *Id.* at 430. Here, Gibbon sustained injuries consistent with her allegations and appeared more credible to officers than the alleged victim in *Wesley*.

Because the plaintiff cannot "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment[,]" the defendants are protected from the federal malicious prosecution claim by qualified immunity.

### C. Fourteenth Amendment Equal Protection

"The Fourteenth Amendment's guarantee of the 'equal protection of the laws' bars governmental discrimination that either (1) burdens a fundamental right, (2) targets a suspect class, or (3) intentionally treats one differently from others similarly situated without any rational basis for the difference. *Green Genie, Inc. v. City of Detroit, Michigan*, 63 F.4th 521, 527 (6th Cir. 2023) (citing *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)). Van Aelstyn alleges that he was intentionally treated differently than Gibbon in the course of the defendants' investigation but makes no mention of being targeted based on a suspect class such as his sex, or facing a burden of a fundamental right. Therefore, the Court construes his equal protection claim as a class of one claim subject to rational basis review.

A "'class of one plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will.'" *Shavers v. Almont Twp., Michigan*, 832 F. App'x 933, 938 (6th Cir. 2020) (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005). For Van Aelstyn to prevail, he must show (1) he was treated differently than Gibbon, and (2) there was no rational basis for that treatment. *See also Lauve v. Winfrey*, 852 F. App'x 184, 187 (6th Cir. 2021).

- 26 -

The complaint contains allegations the defendants' actions "unlawfully deprived Plaintiff of his Fourteenth Amendment right to Equal Protection under the law from theft and violence that similarly situated citizens would have been given, had admissions of such theft and violence been made by other parties." [Record No. 17, p. 12] The allegedly violative actions include:

> [I]ntentionally (a) refusing to obtain or review the exculpatory audio recording, (b) failure to follow-up with witnesses and neighbors, Floyd and Kelli Monroe, (c) advising an individual to file an EPO when said individual repeatedly states that they are not afraid of the other individual and that they intend to leave the state, (d) not thoroughly interviewing Gibbon to follow-up on questions as to whether she started the altercation with the Claimant; (e) permitting witnesses to be interviewed together, (f) ignoring and failing to investigate Gibbon's admission of automobile and other personal property theft, as well as prior threats of violence to the Claimant, (g) filing a false criminal action against the Plaintiff, (h) making, influencing or participating in the decision to prosecute the Plaintiff, (i) "seizing" the Plaintiff without probable cause, (j) depriving the Plaintiff of his liberty and property, and (k) pursuing and prolonging a false prosecution without probable cause, that later terminated in the Plaintiff's favor.

[*Id.*]

Assuming Van Aelstyn was treated differently in these respects, the record contains multiple explanations of why the defendants would have rationally treated him differently than Gibbon. The first is the difference in the perceived severity of their injuries. In the early hours of July 9, 2021, Sparks suggested Gibbon file an emergency protective order after he observed the large gash on her back and Gibbon told him she had a "blowout" with the plaintiff. [Record No. 66-5 at 02:25:50-02:26:05] Sparks made further comments indicating his concern with the magnitude of the injury, and Floyd Monroe also noted its seriousness. [Record No. 66-5 at 02:30:40-02:30:50; and Record No. 73, CD 2 (12), at 4:31:13-4:31:29 p.m.] Van Aelstyn told the defendants that Gibbon had assaulted him, and Officer Radford later photographed him. [Record No. 72-2] But Van Aelstyn displayed no injuries comparable in severity to the gash

- 27 -

on Gibbon's back which could lead a rational law enforcement officer to assume he was the primary aggressor or that, at minimum he faced little credible threat to his safety.

Next, based on the defendants' perception of the plaintiff's physical size in relation to Gibbon, Van Aelstyn was larger and stronger. In Gibbon's petition for protective order, his height and weight were listed as 5 feet 9 inches, 190 pounds. [Record No. 66-12] Photographs taken after the fact also demonstrate that Van Aelstyn was an imposing physical figure with a muscular build. [*See* Record No. 72-2.] Additionally, when asked whether she initiated the altercation, Gibbon told police, "I can't hurt him . . . he's a big son of a gun." [Record No. 73, CD 1 (4), 03:31:11-03:31:21 a.m.] Sparks and Carnes could rationally have decided to pursue their investigation against Van Aelstyn on the basis that the plaintiff was capable of causing serious harm to Gibbon, while the opposite would likely not be true given the parties' significant size difference. Consequently, the record reflects multiple rational reasons for which Officer Sparks and Sergeant Carnes could have decided to investigate and pursue criminal proceedings against Van Aelstyn and not Gibbon. Accordingly, Van Aelstyn's class of one equal protection claim will be dismissed.

## IV.

Based on the foregoing analysis, it is hereby **ORDERED** as follows:

1.      The defendants' motion for summary judgment [Record No. 66] is **GRANTED**.

2.      The defendants' motion to exclude expert testimony [Record No. 65] and motion in limine [Record No. 94] are **DENIED** as moot.

3.      The plaintiff's motions in limine [Record Nos. 89-92] are **DENIED** as moot.

- 28 -

Dated: January 8, 2025.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky